# Case No. 8,957.

## MAGNIAC v. THOMSON.

[2 Wall. Jr. 209.] [1]

Circuit Court, E. D. Pennsylvania. April Term, 1852. [2]

EQUITABLE RELIEF — EFFECT OF DEMURRER IN EQUITY—UNCONTROLLABLE EFFECT OF A LIBERATION ON CA. SA.—RELIEF AGAINST MISTAKE OF LAW.

1. Where a bill sets forth such leading facts as do not, when analyzed, show a case of fraud or mistake—allegations or averments in the bill that there was fraud or mistake, and the expressions "fraudulently," "deceitfully," "by mistake," &c., interspersed throughout it, will not bring the case within equitable jurisdiction, even on a demurrer to the bill.[2]

[Cited in Voorhees v. Bonesteel, 16 Wall. (83 U. S.) 29.]

2. Admitting, for the sake of argument, that the allegation of a mistake of the law would give jurisdiction to a court of equity in a common case, and be a ground for relief; yet the court will not listen to the allegation that a member of the bar has made such a mistake. It can hardly be successfully averred even by the party whose counsel, he would confess, has made it.

3. Where one, having arrested his debtor defendant on a ca. sa., sets him at liberty on certain terms, at his instance, it being "expressly acknowledged" by the defendant that this is done "for his accommodation, without any prejudice whatever to arise to the plaintiff's right by the enlargement" as aforesaid, "or otherwise howsoever;" the debt is paid at law. No further execution of any sort can be issued there. And the agreement having been drawn and signed by the plaintiff's own attorney, a learned and able counsellor at law, a court of equity will not interpose to enjoin the defendant from pleading this discharge as payment, by allegations in a bill demurred to, that there was either a mistake common to both parties as to the effect of the agreement; or else that the plaintiff not knowing its effect, while the defendant did know it, it would be a fraud in the defendant now to profit of the plaintiff's misconception or ignorance of what he was doing; and set up at law the payment by his liberation on the ca. sa.[2]

On the 19th of December, 1825, John R. Thomson, now a senator of the United States from the state of New Jersey, previously to a marriage then contemplated with a daughter of the late Honourable Richard Stockton, Esquire, of that state, agreed with her father to make a settlement upon that lady of a considerable estate upon this, as a final, among several other previously mentioned trusts, st. that if there should be no issue of their marriage, then the said estate should, on the death of either party, go to the survivor. From a really insolvent condition of Mr. Thomson's affairs at that date, arising from a large foreign suretyship, contracted by his agent abroad, and from other circumstances confessedly not known to Mr. Stockton or his daughter, it appeared afterwards to be a matter of doubt whether this settlement could be supported as against creditors. And Mr. Thomson having been arrested soon after the settlement on a ca. sa. by these same persons who are now here complainants, Magniac & Co., and who were then creditors by judgment for about $22,000, in a common law suit in this court, he made on the 8th April, 1830, the following agreement, an opulent relative being a guaranty for its performance, and Charles Jared Ingersoll, Esquire, the attorney of the plaintiffs, Magniac & Co., who himself drew the agreement, consenting by writing to the "defendant's enlargement on the terms stated" in it. The agreement—referring to the original case, in this court, of No. 18, October term, 1826,—being, as already stated, in Mr. Ingersoll's handwriting, was filed among the court pa-

─────

1 [Reported by John William Wallace, Jr., Esq.]

2 [Affirmed in 15 How. (56 U. S.) 281.]

2 [Affirmed in 15 How. (56 U. S.) 281.]

pers of the case, and was in these words: "Defendant having been taken by ca. sa. in this suit, at his instance, it is agreed that he be set at liberty on giving security to abide the event of an issue to be formed for ascertaining, by judicial decision, whether he has the means, by the property in his marriage settlement, or otherwise, of satisfying the judgment. Both parties hereby consenting to try such issue at the ensuing session of the circuit court of the United States, on the merits, without regard to form. It being expressly acknowledged by the defendant that this agreement is made for his accommodation, without any prejudice whatever to arise to the plaintiffs' right by the defendant's enlargement on security as aforesaid or otherwise howsoever." The marshal accordingly returned to his ca. sa. "c. c. and enlarged by agreement of plaintiffs' attorney." With a view to carry out the agreement, Mr. Ingersoll, for his clients, Magniac & Co., and J. P. Norris, Esquire, as attorney for Mr. Thomson, on the 3rd of June, 1830, made this second agreement: "Whereas, a feigned issue has been agreed upon by the parties in this case, for the purpose of ascertaining, by law, whether the defendant, J. R. Thomson, has the means, by the property of his marriage settlement, or otherwise, of satisfying the judgment recovered against him in this court, to October Sess. 1826, No. 18,—now, it is hereby agreed to be the understanding of the parties to the suit, if the plaintiff recovers, that the liability of the security for said defendant shall be to the extent of the property actually settled by said defendant on his intended wife, by virtue of a marriage settlement, dated the 19th day of December, 1825. And if judgment shall be for the defendant, that the said property contained in said settlement, shall be entirely discharged," and the security entered as above stated, entirely at an end, &c.

The validity of the marriage settlement was tried in this court at April term, 1831, in the case, well remembered in this circuit, of Magniac v. Thomson [Case No. 8,956], where after a vigorous assault upon it by J. R. and C. J. Ingersoll, the settlement was powerfully and successfully defended by Mr. Binney, and under a strong charge of the late Mr. Justice Baldwin, sustained by a verdict of a jury. From this court the case was taken, in 1833, to the supreme court at Washington, 7 Pet. [32 U. S.] 348, where the principles of Judge Baldwin's charge were the subject of another sharp attack, but where it was the unanimous opinion of the court, that the judgment of the circuit court ought to be affirmed. The marriage settlement therefore could never be disturbed. There was no issue of the marriage, and Mr. Thomson having survived his wife, he became of course entitled under the terms of the settlement to the whole of the property himself. The complainants now filed this their bill in chancery for an account of that property, and its profits since

the expiration of the trust; and an application of both to the payment of the judgment; and an injunction against parting with them, so far as they might be liable to the judgment, and against setting up at law as a defence, (a matter which it was averred the defendant threatened,) that the debt had been discharged or affected; and that the validity of the judgment on the law side of the court might be declared by this court to be fully established: and the marshal's return to the ca. sa. regarded as an 'inexistence,' so far as it might be used to violate the obligations of the original agreement of 8th April, 1830.

The bill was a good deal argumentative, under a form apparently narrative. It went back to, and coloured highly the circumstances of the marriage settlement, so far as Mr. Thomson was concerned with them. Reciting the original ca. sa. and the arrest of Mr. Thomson, it set forth that he must have either always remained in close confinement, or have obtained his discharge, by proceedings under the Pennsylvania acts for the relief of insolvent debtors; his proceedings under which, if successful, would have driven him to make a deed of assignment to his creditors, of all his estate and property whatsoever, including the right of survivorship and reversion in the settled property upon his wife's death without issue, and have conferred upon him, in return, only an immunity against liability to further bodily restraint or confinement for the non-payment of such of his debts, as were at the date of such proceedings in insolvency. due by him; and any petition for the benefit of which acts could have been filed by him, only after lying three months in custody and confinement under the said writ of ca. sa.: that thereupon the defendant, being so arrested at the suit of the complainants, it was agreed in writing between them and the defendant, that they should, without prejudice to their rights and remedies against the said defendant, permit the said defendant forthwith to be enlarged from custody, &c. The bill averred that by this agreement, &c., the defendant obtained no further advantage than that of "a present discharge from close custody, and a judgment that he had then no means of satisfying; the judgment, the said agreement and proceedings under it being a substitute for proceedings in insolvency; by which substitute, the said defendant, if he did not acquire the same extent of immunity which an insolvent discharge would have bestowed, at least obtained whatever immunity he did acquire by means less painful than an insolvency." It set forth the entire acquiescence of the complainants in the validity of the marriage settlement as adjudged on technical grounds merely, so far as Mr. Thomson was concerned: and that the said trial having resulted unfavourably to the complainants, they were content to abide thereby until the defendant, if it should so turn out in the course of time, acquired wherewithal to satisfy the

judgment. And having patiently awaited the return of his solvency, and his ability to meet his obligations, and he having become once more restored in his circumstances, and a man of wealth, the complainants had recently called upon him to pay, in the expectation that, in consideration of the extreme hardship of their case, (in which the payment of a judgment arising out of a cash loan had been disappointed by a settlement of a debtor upon his wife, although insolvent when he made the settlement,) he would meet the call upon him, not according to the letter only of the agreement, but in the spirit of his own professions of obligation to the complainants for the same, and of their forbearance toward him in his adversity, when, to their astonishment, they were answered by him—not that he was unable to pay or that he would be even 'inconvenienced' by paying off the amount of the judgment, but—that inasmuch as according to law a party discharged by the plaintiffs' consent, after being taken on a ca. sa., was released from the debt, even though he had pledged himself to his creditors not to plead such discharge,—he, the defendant, proposed to set up this said or supposed rule of law, and the said discharge for his protection against his own agreements and pledges, and against any further proceedings by the complainants under their judgment, and that he, the said defendant, then actually regarded and should to the court insist that the said judgment,—his agreement to the contrary notwithstanding,—was cancelled, and himself no debtor at all.

The bill represented that the complainants were prevented from proceeding at law by the said rule of law so set up. The use of or any resort to which they averred would be contrary to equity; because the defendant having pledged himself that he would not resort to the said rule of law,—by agreeing that the taking of the said defendant into and discharging him from custody should not prejudice the rights and remedies of the then plaintiffs,—it would be in direct fraud of his agreement, should he now resort to it, to the prejudice of those rights and remedies. And because the agreement that the defendant should be discharged from custody, was obtained by means, which were inequitable and fraudulent, namely, by a stipulation on the defendant's part—now offered to be violated by him—that the discharge should be without prejudice to the complainants; which means were further inequitable and fraudulent, in this, that the consideration for the discharge was illusory, fraudulent and unreal; and was a stipulation, that the discharge should be without prejudice to the complainant; a stipulation which the defendant could keep or break at his pleasure, and which supposed consideration for the discharge—namely, that the same should be without prejudice,—was not a consideration sufficient to support the said agreement for the discharge. And because

the said mutual contract that the defendant should be discharged from custody, but withal, that such discharge should not prejudice the complainants' rights or remedies, was either a contract entered into by the common error of both parties in this, that they both erred in supposing that the contract could be carried into effect, when, in fact, it could not be, (of which said common error the defendant now sought to take advantage,) or it was a contract entered into, the complainants alone being in error, in supposing that the contract could be carried into effect, when, in fact, it could not be, the defendant, at the same time well knowing, and fraudulently availing himself of the error, and entering into the contract for the purpose, and with the fraudulent intent of taking advantage of the error, and intending that he should, by he contract, obtain all the benefit and advantage of a discharge from the ca. sa., and that the complainants should not obtain the benefit of the corresponding stipulation, that the discharge should be without prejudice to their rights and remedies, of which fraud the defendant now sought to take advantage. The complainants then averred that when they accepted the stipulation at the hands of the defendant, that the discharge should be without prejudice to them, they did actually and firmly believe that it was capable of being enforced at law, as well as in equity, according to its terms, and were wholly unaware that the defendant could or would use, or resort to any rule of law whatever, whereby to escape its force and effect.

They set forth that the marriage settlement having been made to secure the property to the wife and children, and on the wife's death childless, to pass it in gross to the husband, had now done its office, and could go no further, and that it would be inequitable that the issue formed under the agreement, and in the framing and on the trial of which, it was assumed by the court, and admitted by the defendant, that the settled estate was liable to the judgment, but for the protection afforded by the settlement, should be construed to have for its effect and consequence, that which was not contemplated by the parties, and was not sanctioned by the court, and which, in itself, was wholly contrary to justice, namely, the discharging from just liability the estate which, in consequence of the defendant's reversion and survivorship, had now come back to him, as completely as he ever did or could own it or any other property.

To this bill, the defendant now demurred, setting forth for cause, that "if the taking into custody, &c., under the ca. sa. was a legal discharge of the alleged debt, the complainants are not relievable in equity from the effect thereof for or by reason of any act, matter or anything alleged in the bill; and if the said taking into custody was not such a legal discharge, then the complainants have full, adequate and complete re-

lief at law." And the case was accordingly heard on the bill and demurrer.

Charles Ingersoll, in support of the bill.

I. Construction of the agreement of 8th of April, 1830. If this paper meant less than the plaintiff insists, its last sentence beginning "it being expressly acknowledged," would have been omitted altogether. That sentence is not merely without purpose or sense, but is directly in the teeth of the meaning of the parties to the contract, if not intended to bind the defendant by a promise to stand by the judgment after the discharge as much as before. The words "or otherwise howsoever" in the case of extremely formal papers, in which the meaning of the parties is expressed at great length, might perhaps have little force, but in a brief stipulation such as this, drawn up in haste probably, and in order to an immediate and pressing object, they ought to have their full force and popular construction. They should be interpreted to signify that if by the words which precede them the plaintiffs' interest under the judgment are not fully guarded, the defendant shall give them protection "otherwise howsoever." They amount to a covenant for further assurance. The agreement interpreted in any other way leads to the absurd conclusion that the plaintiff perilled his whole debt without a motive, while the defendant obtained his enlargement from custody, giving no equivalent whatever therefor.

If the plaintiff had refused all arrangement, and simply permitted the defendant to remain in custody, he would have resorted to the insolvent law of Pennsylvania, or of the United States. In the former case there would have been a trial of the question whether the defendant was possessed of property more advantageous to the plaintiff than the trial in the federal court. In the latter case, of an application by the defendant under the United States insolvent law of 1800 [2 Stat. 19], the plaintiff, had he succeeded in breaking the trust, would have got the whole trust property, and whether he failed or succeeded would have had security of the most binding sort, in the custody of the defendant's person. The plaintiff therefore gained nothing by the agreement, for it is not pretended on the other side that he got anything by it, if he did not get security of a superior character for his debt, or a better trial of the question upon which it turned. He simply, as expressed by the agreement, set the defendant at liberty at the defendant's instance. He did an act of kindness, upon the defendant's agreement that it should be without prejudice. The defendant, on the other hand, acquired first his immediate liberty, which he could get only by agreement; and second, a trial of the question of property in the federal court; a better trial for him than one in the common pleas, and much better than under the insolvent law of 1800, because that would have

detained him in custody during the time the cause was pending which, as appears by the statement, was about three years. To give any other interpretation to the agreement would be to stultify the plaintiff, who dealt with the defendant liberally enough, but did not go the length of giving away his debt.

Assuming then our construction of the agreement to be the true one, the next question is:

II. Whether the case is one for equitable relief? The principles and cases found under the equitable heads of fraud and mistake, are applicable to the facts before the court.

1. Fraud. If it were a case of mere breach of contract, it would not be cognizable in equity. Nor if it were a case of fraudulent breach of contract, and not more, for even fraud is cognizable at law unless there be in the case something to oust the jurisdiction. But here is a case where there can be no relief at law, because (we assume for the sake of argument) the courts of law have declared that a judgment is paid when the defendant is taken under a ca. sa., and that even the defendant's own agreement to the contrary shall not change the rule; that a defendant's conduct in entering into such an agreement and then violating it, is "very scandalous," as the courts have termed it (per Grose, J., Blackburn v. Stupart, 2 East, 243), but that there is no remedy at law. The fraud is palpable. The defendant is in custody. He says to the plaintiff, the rule of law is that if you discharge me, the judgment is satisfied; but I pledge myself that as between you and me there shall be no such rule, and that if you will let me go, your judgment shall stand exactly as it did before your ca. sa. was issued. This agreement, the defendant, having had the benefit of it, utterly violates. He declares the judgment to be good for nothing, and the agreement good for nothing, and when the plaintiff takes proceedings at law he sets them at defiance. That is, having trepanned the plaintiff into the bargain by means of a promise that he will not exact the penalty of the position, he turns round and insists upon it. The plaintiff then comes into equity. This case is like that of a man who, holding a note five years and eleven months old, is told by the drawer to wait six weeks longer before he sues, and that that the note shall be as good at six years old as it was before, and then being refused payment, and having gone into court, the defendant pleads the statute of limitation against him; like that of a plaintiff in a judgment who enters satisfaction in order that the defendant may be able to make title to a certain portion of the real estate bound by the judgment, the defendant having agreed in writing that the satisfaction should be cancelled, and the lien of the judgment restored as to the rest of his real estate, immediately after his sale was effected, and then is told by the defend-

ant, your judgment is gone, and you will never get another; like that of one who, having given his receipt in full, but without value, to a debtor, in order that he might settle with a third person, is turned upon by the debtor and told that his debt is paid, and here is the receipt for it; like that of an obligee who, having released one of two co-obligors for the mutual purposes of obligee and obligors, and with the agreement that the discharge should be without prejudice as to the remaining obligor, is informed by him, after the object of the discharge has been accomplished and the advantages from it attained, that he does not mean to hold himself liable after the release of his co-obligor.

These are cases not distinguishable from that before the court, and they are obviously for relief in equity. They are all cases in which a party has gained a fraudulent advantage of another, which not being relievable at law, will be relieved in equity, unless something can be shown to the contrary.

It will be pretended by the defendant that to relieve under this agreement of 8th April, 1830, would be to run counter to that policy which, favouring liberty of the person, has refused to permit a second ca. sa. for the same debt. To this the answers are: (a) There are two cases to the point that this rule concerning the liberty of the person, yields before proof of the defendant's fraud, in procuring his discharge. Baker v. Ridgway. 2 Bing. 41, 9 Moore, 114, and Holbrook v. Champlin, 1 Hoff. Ch. 148. (b) On principle it would be strange indeed if that policy of law and equity and of all society which sets its face against fraud should give way before the co-called policy here invoked, which amounts to nothing at all since arrest for debt has been abolished, and which never did amount to more than a train of unfortunate decisions, which if they could be recalled, would never be made again.

2. Mistake. It is averred in the bill as follows: "And your orators aver that when they accepted the said stipulation at the hands of the said defendant, namely, that the said discharge from custody of the said defendant should be without prejudice to your orators, they did actually and firmly believe that the said stipulation was capable of being enforced by your orators at law as well as in equity, according to the terms of the said agreement, and were wholly unaware that the said defendant could or would use or resort to any rule of law whatever whereby to escape the force and effect of the said stipulation so contained in the said agreement." The plaintiff here avers that he mistook the law, and that the defendant availed himself of his mistake to get a discharge from custody, which, if the construction of the agreement above submitted be the true one, he obtained at the expense to the plaintiff of his entire debt, for which he received under the agreement no manner of consideration or compensation. The general rule is

admitted, that a mistake of law affords no ground of relief. But when the mistake of one party is so great, and is so grossly taken advantage of by the other, that the bargain becomes not "do ut des" but "do ut non des," not money paid or a thing done for a consideration but money paid or a thing done for less than nothing, the precedents are that relief will be granted without distinction between ignorance of law and ignorance of fact. Champlin v. Laytin, 1 Edw. Ch. 472.

The rule "ignorantia legis neminem excusat" pushed to extremes would cover fraud, and the averment of the bill here is in truth averment of fraud. To avail one's self of the ignorance of the other party of the law may be fair, or it may be fraudulent. If the grantor understand the covenant of warranty contained in his deed, and the grantee do not, the grantee cannot therefore come into equity and be relieved from the effects of such ignorance. But if the grantor be aware that by law he has no title to the estate which he conveys and the grantee in paying his money for it receives only so much moonshine, the grantee is relievable; for the grantor defrauds him if he pushes his advantage over him to such lengths, though that advantage be but in knowing the law when the other does not. And if here the plaintiff in his ignorance of the law just gave away his debt and the defendant got a receipt in full for nothing; if the plaintiff sold his judgment of $22,000 for a right which was no right, then the defendant has overreached him, he has availed himself of the plaintiff's mistake of law with a vengeance. It is a case of fraud and equity will make him whole. The cases on this head are numerous and go very far. Lansdown v. Lansdown, Mos. 364; Bingham v. Bingham, 1 Ves. Sr. 126; Pusey v. Desbouvrie, 3 P. Wms. 315–321; Evans v. Llewellyn, 2 Brown, Ch. 150; Farewell v. Coker, cited in Cholmondeley v. Clinton, 2 Mer. 352; Cann v. Cann, 1 P. Wms. 727; Acton v. Peirce, 2 Vern. 480; Cannel v. Buckle, 2 P. Wms. 243; Naylor v. Winch, 1 Sim. & S. 564; Hunt v. Rousmanier, 1 Pet. [26 U. S.] 1; Lowndes v. Chisholm, 2 McCord, Eq. 463; Lammot v. Bowly, 6 Har. & J. 500; Evants v. Strode, 11 Ohio, 481; Drew v. Clarke, Cooke, 374–380.

It is not necessary, to entitle the plaintiffs to come into equity with this bill, that they should be absolutely without relief at law. Equity has jurisdiction when relief at law is doubtful or difficult. Weymouth v. Boyer, 1 Ves. Jr. 424; Bynum v. Sledge, 1 Stew. & P. 138; Ludlow v. Simond, 2 Caines, Cas. 39; Livingston v. Livingston, 4 Johns. Ch. 287. "It is not of course to be taken as an answer to a bill praying relief, that the matter might be taken advantage of at law." Campbell v. French, 2 Cox, Ch. 367. The averment of the bill is, that plaintiffs are prevented from proceeding at law.

III. How stands the question at law? The defendant contends that issuing and execut-

ing a writ of ca. sa. at law, discharges the debt at law, and satisfies the judgment, and this although the defendant expressly agrees that it shall not have such affect. The plaintiffs submit the rule on this subject to be, that issuing and executing an execution presumes a satisfaction. To this extent, and no further, has the law gone in regard to any kind of execution; and a careful examination will show that it has never fairly gone further in this regard as to a ca. sa. than as to any other writ of execution, and that the two English cases (and certain New York cases which were decided on their authority) were hastily decided, and without support from principle, reason or authority.

It was originally questioned whether a judgment could have more than one execution, and it was held accordingly, that any writ of execution being once issued, the judgment was functus. But the rule was after established otherwise, that is, that no execution issued is a satisfaction, or prevents an alias, unless satisfaction appear by the return. See the old cases quoted by Lord Hobart, in Foster v. Jackson, Hob. 57. No rule of law can be established so inimical to liberty or so severe upon debtors, as that which would say, that the creditor shall in no way deal with his debtor for his liberation from imprisonment, without discharging the debt and satisfying the judgment. See Jackson v. Knight, 4 Watts & S. 412. A fi. fa. executed presumes a satisfaction; there can no other execution be issued till by the return of the first it be shown that there has not been satisfaction. Slie v. Finch, 2 Rolle, 57; Miller v. Parnell, 6 Taunt. 370. A ca. sa. executed does no more, it presumes a satisfaction.

Many cases, both English and American, may be found, and will be cited by the defendant, where it has been said, and some where it has been held, that "plaintiff receives a satisfaction in law by having his debtor in execution." Hobart, C. J., reasons himself to this in Foster v. Jackson, already cited. This is said in many other cases. Tanner v. Hague, 7 Term R. 420; Ransom v. Keyes, 9 Cow. 138; Crary v. Turner, 6 Johns. 51; Yates v. Van Rensselaer, 5 Johns. 364; Little v. Bank, 14 Mass. 443; Freeman v. Ruston, 4 Dall. [4 U. S.] 214. If this be true, or if there be such a principle in the law, then it is a reason, and a sufficient reason, why the plaintiff may not by any agreement with the defendant, relieve him from imprisonment, and yet preserve the debt and to the judgment its efficacy at law. If this reason be not sound, or if there is no such principle in the law, then no other reason can be given, and none other is in any of the cases given, why the law should not regard and protect such agreement, or why the law should assume for itself the anomalous and discreditable position into which Grose, J., puts it in Blackburn v. Stupart, 2 East, 243, where he says that though the conduct of the defendant may have been "very scandalous," there is for the plaintiff no relief.

That there is any such principle or rule in English law, as that plaintiff receives satisfaction by having his debtor in execution, is contradicted by Lord Coke, in Blumfield's Case, 5 Coke, 86a.[3]

By all the decisions holding that if the defendant after escape, the judgment is good (Basset v. Salter, 2 Mod. 136); for if the judgment is functus by executing the writ, nothing after can restore it. By the decisions holding that executing a ca. sa. on a privileged person, who is after discharged, does not make void the judgment. Merchant v. Frankis, 2 Gale & D. 473. By the statute of 21 Jac. I., that if defendant die in execution, the judgment shall be still effective. By the decisions that an after insolvent's discharge, leaves the judgment effective. Nadin v. Battie, 5 East, 147. By the cases holding that the new writ is in no case void, but voidable, only on cause shown. 1 Scott, 404.

The class of English cases, where it was held that a plaintiff having a judgment against several defendants, could not release one from execution, without entirely losing his debt as to the others, is easily intelligible, and is the law of fi. fa. as well as ca. sa., and is even the law of original liability, for there is no way by which one of several partners can be discharged from an original liability without discharging the others. And this principle explains various cases. Denton v. Godfrey, 11 Jur. 800; Herring v. Dorrell, 4 Jur. 800; Ballam v. Price, 2 Moore, 235. So, too, the class of cases where the plaintiff took, in satisfaction of his judgment, a new agreement, and it was held that this judgment was gone, and he must resort to suit on his new agreement, are clear in principle and reason. Jaques v. Withy, 1 Term. R. 557; Birch v. Sharland, Id. 715; Vigers v. Aldrich, 4 Burrows, 2482; Goodman v. Chase, 1 Barn. & Ald. 297; Da Costa v. Davis, 1 Bos. & P. 242.

The only two English cases going the length that defendant asks in this case, and holding the judgment satisfied, and that plaintiff can have no further remedy in his then suit, whatever defendant's agreement may have been, are Clark v. Clement, in 6 Term R. 525, and Blackburn v. Stupart, in 2 East, 243. In Thompson v. Bristow, reported by Barnes, Notes Cas. 205, the report is in a line, and the question seems to have been one of continuance on the roll. The reporter, at best, is not the most satisfactory.

The two former cases drive the law to the position assumed for it by Grose, J., in Blackburn v. Stupart, that however "scandalous" the conduct of the defendant may

---

[3] Lord Coke says expressly "The execution of the body is no satisfaction, * * * but a gage for the debt," and he calls on his readers to note "good differences between execution not valuable, as of the body of the defendant, and execution valuable, as of lands," &c.

have been, the law can give the plaintiff no relief against his fraud. Their authority is much shaken, and in some cases contradicted, by later English decisions: as in Baker v. Ridgway, 9 Moore, 114, 2 Bing. 41, which was the case of voluntary discharge by plaintiff from arrest, and is authority for the position that if plaintiff were induced to the discharge by the defendant's fraud, it shall not avail him, but the judgment shall be held effective. In Atkinson v. Bayntun, 1 Scott, 404, Sergeant Wilde in argument, doubts the soundness of the principle established by Blackburn v. Stupart and Clark v. Clement; and Tindal, C. J., plainly thought with him. Parke, J., says, that in Jaques v. Withy, Ashurst, J., spoke too broadly, and that Buller disagreed; and quotes Baker ·v. Ridgway, that if there were fraud in defendant's procurement of discharge, he may be re-arrested.

The law of ca. sa. in this regard, is refused to be extended to cases of attachment for not complying with award, and Holroyd, J. says, "Indeed those cases (meaning Clark v. Clement and Blackburn v. Stupart) were considered so strong that the legislature interposed. Good v. Wilks, 6 Maule & S. 413.

But be the English law what it may, the Pennsylvania courts hold as we ask this court to hold. In Sharpe v. Speckenagle, 3 Serg. & R. 464, it was held by the supreme court of Pennsylvania on general principles, that a discharge under an insolvent act, of one arrested on a ca. sa., did not discharge his surety for stay of execution. Chief Justice Tilghman says: "I take the law to stand thus: If the plaintiff takes the body of the defendant in execution, he can never have against him while in jail, any other execution; but if he dies in jail, he may have execution against his lands or goods, by virtue of the statute 21 Jac. I. c. 24. I think, too, that in case of death, the better opinion is, that the plaintiff might have had execution against the defendant's lands or goods at common law. The statute 21 Jac. recites, that it had been greatly doubted, &c. It certainly had been doubted, although the decision reported in Blumfield's Case, 5 Coke, 86, was expressly in favour of the execution, and for reasons not easily answered: because the plaintiff having secured his legal remedy, was in no default, and therefore ought ·not to be injured by the act of God, which works wrong to no man: and it would be most unjust, if in such case, the goods of the defendant should not be liable, &c. In the case of Foster v. Jackson, Hob. 52, decided in the reign of James I., the law was indeed held contrary to Blumfield's Case, but in my opinion, for reasons more technical and artificial, but less substantial and satisfactory. In that case, however, although, &c. . . . . . yet it was laid down, that the taking on the ca. sa., 'was not the perfect satisfaction in nature to all purposes, and against all persons.' On the contrary, 'that

it was clearly no satisfaction, so as to bar the plaintiff to seek satisfaction against another for the same debt.' This principle the court held 'decisive' of the case before them, as the discharge 'was effected by the act of law, which, like the act of God, injures no man." There was, indeed, in the Pennsylvania act an express provision, that no other person should be acquitted by the principal debtor's discharge, which the court say they could call in aid, if necessary; but it is not called in aid, the case being decided on common law principles. The case of Jackson v. Knight, 4 Watts & S. 412, in the same court, is much stronger and absolutely in point. By agreement in writing, endorsed on the writ, and signed by the counsel, the defendant's body was to be released 'without prejudice to his future liability for the debt and interest of the judgment, which is to remain in full force and unimpaired.' The court held that the agreement prevented a discharge of the judgment against him, which remained a lien on his lands, and so encumbered them as to make an encumbered and unmarketable title. And the court manifestly approves of the charge of the court below, that 'such a discharge is for the benefit of the defendant: it comports with humanity, justice and common sense:' and of the position that the principle which the defendant here seeks to maintain, 'has been carried to an unreasonable and oppressive length, and often to the great injury of unfortunate debtors;' and that no case precisely like the one before them, had been shown."

Reverting to the language of Chief Justice Tilghman, who says, that neither the act of the law, nor the act of God, ought to work an injury to the plaintiff, we ask, where shall the act of the defendant himself—or the act of the plaintiff, done for his benefit and at his request,—which is tantamount to the act of the defendant himself—work any injury either?

J. M. Read, Mr. Cadwalader, and W. A. Jackson, in support of the demurrer.

The thorough view which we propose to take of this case at law, will very much settle the question of equitable aid; for it will show how pervading the rule ·at law is. The creditor, by issuing· a ca. sa., chooses the body of the debtor in preference to his lands or goods, as the source of his satisfaction. By making an arrest, he secures to himself the satisfaction he has chosen, and is thereby estopped from resorting to any other mode of execution. As long as he holds the body, he is in the possession of a continuing satisfaction, and when, with his consent, the body is released, he confesses that his satisfaction is complete; and if the release is accompanied by any agreement with the debtor, or third parties acting for him, such agreement (whatever may be its terms) is a new and original contract, which can in no way affect the completeness of the satisfac-

tion previously received. This is the English law.

From a series of decisions upon these points, covering four centuries, only a single case (Blumfield's Case (1596) 5 Coke, 87), can be cited in conflict with the rule thus stated. The statement of facts in Blumfield's Case by Lord Coke is this: "Two men were bound jointly and severally in a bond, one was sued, condemned, and taken in execution, and afterwards the other was sued, condemned, and taken in execution, and afterwards the first escaped and thereupon the other brought audita querela." Judgment was given against the payer. The decision is law, and in harmony with the principles above laid down. Lord Coke, however, in his annotation cites the Case of Jones and Williams (elsewhere unreported), "where two men were condemned in debt, and one was taken and died in execution, yet the taking of the other was lawful." This case may also be law, but makes nothing against the present appellee. Lord Coke proceeds, "and then" (in Jones and Williams) "it was resolved by the whole court that if the defendant in debt dies in execution, the plaintiff may have a new execution by elegit or fi. fa. for divers reasons," which he goes on to enumerate. It is for this passage that the case has been often heretofore and is now cited, the value of the authority being merely this: that Lord Coke in reporting a principal case, which is entirely with us, refers to an unreported case which is also with us, but in which there is a dictum against us of which he appears to approve. But whatever may have been its original authority, this dictum has been repeatedly declared not to be law. Blumfield's Case was argued in 39 Eliz., and published in 3 Jac., and must consequently have been well known in 4 Jac., when the case of Williams v. Cutteris (1607) Cro. Jac. 136, also cited as Cutter v. Lamb, was decided. Yet in the last-mentioned case the defendant having died in execution, the court held that the plaintiff had no further remedy. In Foster v. Jackson (1613) Hob. 52, 57, where the same point arose, Chief Justice Hobart makes the same decision, and in the course of an elaborate opinion approves the Cases of Blumfield, and Jones and Williams, but condemns the dictum which accompanies them. Since then, in Sir Edward Coke's Case (1624) Godb. 294, and in Cave v. Fleetwood (1630) Litt. 325, it was pronounced "not to be law," and in Taylor v. Waters (1816) 5 Maule & S. 103, where a similar point arose and counsel urged its authority, it was wholly disregarded by the Court. From that time up to the present, though similar questions have frequently arisen, it is believed that this citation has never been offered to the consideration of an English tribunal.

Having disposed of this dictum, we will proceed to examine, first, those cases in which it has been held that the release of a

debtor in execution by the plaintiff's consent, is a satisfaction of the judgment and execution, and also an extinguishment of the debt.

In Whiteacres v. Hamkinson (1627) Cro. Car. 75, one of two co-obligors pleaded that the other, being in custody in a suit upon the same bond, the sheriff permitted him to go at large, and upon demurrer, it was adjudged for the plaintiff; but, say the court, "if he had pleaded that the sheriff suffered him to go at large by the license or command of the plaintiff, it had been a discharge, and might have been pleaded in bar."

In Walker v. Alder (1649) Style, 117, the plaintiff consented to an interview with the defendant beyond the prison bounds, but having failed to come to an agreement, recommitted him. The court held that "the execution was discharged by the prisoner's going at large."

In Price v. Goodrick (1653) Style, 387, Chief Justice Rolle held that in a judgment against three, if one be taken and discharged with plaintiff's consent, the other two cannot be taken upon the same judgment.

In Basset v. Salter (1677) 2 Mod. 136, the decision in Walker v. Alder first above cited, is affirmed, and the court say, "He (the defendant), could never after be in execution at his suit for the same matter."

In Thompson v. Bristow (1743) Barnes, Notes Cas. 205, "the defendant was taken in execution, and was afterwards discharged by plaintiff's consent, and a written agreement was entered into by the parties, that the judgment should stand revived for twelve months. After more than a year from the last ca. sa., plaintiff caused defendant to be again taken in execution, without continuance on the rolls, relying on the written agreement. The court held the agreement to be null and void, and made the rule absolute to set aside the last ca. sa., and discharge the defendant out of custody."

In Vigers v. Aldrich (1769) 4 Burrows, 2482, the defendant was released on binding himself to pay the debt by instalments. Upon default, an action of debt was brought upon the judgment. "The court held this to be an absolute consent in the plaintiff to discharge the defendant out of execution, in consideration of a new agreement then entered into, whereby he was to receive several sums of money, instead of the person of the defendant (which was all that he could have had if he had kept the defendant in gaol,) and that he could not bring an action upon the judgment after the defendant had been taken in execution and discharged by the plaintiff's own consent, but ought to have brought a new action upon the case founded upon this new agreement." Yates, J., added, that he could not declare on the old judgment since it was necessary to allege that "it remained altogether unsatisfied."

In the leading case of Jaques v. Withy (1787) 1 Term R. 557, defendant was released

upon giving a bond with warrant of attorney for the debt. A technical error was committed in naming the court where judgment was to be confessed. The original judgment was attempted to be used as a set-off in another suit. Ashurst, J., . . . . "I know of but one case where a debtor in execution, who obtains his liberty, may afterward be taken for the same debt, and that is where he has escaped; but the reason of that is, because he was not legally out of custody. But where a prisoner obtains his discharge with the consent of the party who put him in execution, he cannot be retaken." Buller, J., . . . . "The case of Vigers v. Aldrich, 4 Burrows, 2482, goes to the whole length of this. For it shows that if a defendant has been once discharged out of execution, upon terms which are not afterwards complied with, the plaintiff cannot resort to the judgment again or charge the defendant's person in execution."

In Da Costa v. Davis (1798) 1 Bos. & P. 242, a bond was given conditioned to surrender the defendant, who had been discharged by consent of plaintiff, or pay the debt. The court held the first alternative of the bond was void, being to render a prisoner in execution who had once been discharged.

In Clark v. Clement (1796) 6 Term R. 525, there was a judgment and ca. sa. against Clement and English. English was arrested and afterwards discharged upon agreement with the plaintiff by which he bound himself to surrender, if the debt were not paid within a certain time. Clement then moved to quash the ca. sa. and enter satisfaction on the roll. Rule granted so far as to protect Clement from any arrest under the judgment. Upon non-payment, English being re-arrested, moved to quash the ca. sa. and enter satisfaction; citing the above cited cases of Thompson v. Bristow, Vigers v. Aldrich, Jaques v. Withy. Rule made absolute.

In Tanner v. Hague (1797) 7 Term R. 420, the defendant was released upon agreeing to pay the debt at a future day. On non-payment fi. fa. issued, which the court set aside because "the plaintiff received a satisfaction in law by having his debtor once in custody on execution."

In Blackburn v. Stupart (1802) 2 East, 243, the defendant was released upon agreeing to pay the debt at a future day or consent to execution issuing against his person or estate. Upon non-payment he was arrested, and paid the debt to procure his discharge. This was a rule to set aside the execution, and that the money in the sheriff's hands should be refunded. The court made the rule absolute, and Grose, J., said, "a person cannot be taken in execution twice on the same judgment, whether he had so agreed or not."

In Goodman v. Chase (1818) 1 Barn. & Ald. 303, the defendant agreed to pay the debt and costs, provided his son then in execution for them should be discharged. The case turned upon the question, whether this prom-

ise of Chase, Sr., was within the statute of frauds. Lord Ellenborough, C. J.: "By the discharge of Chase, Jr., with the plaintiff's consent, the debt as between those two persons was satisfied. No case can be cited in which such a discharge has not been held sufficient. Then if so, the promise by the defendant here is not a collateral, but an original promise, for which the consideration is the discharge of the debt as between the plaintiff and Chase, Jr."

In the case of Ballam v. Price (1818) 2 Moore, 235, it was held to be "quite clear that the discharge of one operated as the release of both the defendants." And to the same effect is Eales v. Fraser (1843) 6 Man. & G., 755.

In Herring v. Dorrell (1840) 4 Jur. 800, where two were in prison, and one was discharged by the plaintiff's consent, Coleridge, J., held that the other was entitled to his discharge as of course, and there was no consideration for a promise made by him in order to procure it.

In Denton v. Godfrey (1847) 11 Jur. 800, the facts were similar to those in Clark v. Clement, and on application made, the same rule was made absolute as to the defendants not arrested.

This branch of the case may be satisfactorily summed up by a citation from the First Report of the common law commissioners (1851) Law Com'rs Report, p. 48, at the head of whom was the present Lord Chief Justice Jervis. After recommending that authority be given the plaintiff's attorney to consent to the discharge of a defendant in execution, they proceed to say (15 Law Mag. pp. 132, 133), "but as a discharge by the creditor's authority from custody on a writ of execution, is a satisfaction of the debt, we think the authority should only be binding, so far as the sheriff is concerned, leaving it to the parties to contest the right of the attorney to give the discharge." Such an incidental recognition of the law, coming from so high an authority, proves in the most conclusive way, how thoroughly it is established in England. It remains,

II. To examine into the effect of an arrest and imprisonment upon a ca. sa. generally; the position of the defendant being, that such an arrest and imprisonment, if regular, constitute a perfect satisfaction, so long as the imprisonment continues, and that the nature of the satisfaction can only be impaired by an interruption of the imprisonment through the tortious act of the defendant himself, or the operation of the law in invitum, as against the plaintiff.

In Y. B. 33 Hen. VI. (1455) p. 48, it is said by Davers: "Suppose a man recover against me and take my body in execution, he shall have neither elegit nor fi. fa., nor any other execution, because this amounts in law to satisfaction." So in Y. B. 13 Hen. VII. (1498) p. 1, it is said by Keble: "If on a ca. sa. the sheriff return cepi corpus, the plaintiff shall

never have another ca. sa., for he learns from the return of the sheriff that he was in execution, and then he had the object of his suit."

The most carefully considered case on this whole subject is Foster v. Jackson (1613) Hob. 52, where the defendant died in execution, and the plaintiff brought scire facias against his executors. After examining Blumfield's Case and reviewing the whole subject at length, Chief Justice Hobart says: "But now singly out of the very point, I hold that a capias ad satisfaciendum is against that party as not only an execution, but a full satisfaction by force and act and judgment of law, so as against him he can have no other nor against his heirs or executors, for these make but one person at law." And in concluding he lays down the broad principle on which many of the decisions already referred to are based, especially those where an agreement to surrender has been held to be void, "that the body of a freeman cannot be made subject to distress or imprisonment by contract, but only by judgment."

The law as thus laid, governed all subsequent cases of death in execution until parliament interfered, and by the statute of 21 Jac. I. c. 24, gave the creditor a further remedy against the estate of the deceased.

In Burnaby's Case (1726) 1 Strange, 653, the plaintiffs having the defendant in execution, afterwards petitioned as creditors for a commission of bankruptcy, but the lord chancellor held, "that the body of the debtor being in execution, it was a satisfaction of the debt in point of law, so that they were not creditors who could petition."

And in Horn v. Horn (1749) 1 Amb. 79, Lord Hardwicke, distinguishing between law and equity, says: "The body being detained is not in this court a satisfaction; the reason is because he is detained for the contempt; but at law the detaining the body is a satisfaction, and you cannot afterwards take his goods."

Taylor v. Waters (1816) 5 Maule & S. 103, was assumpsit by one in prison; a set-off was pleaded, and it was replied that the debt so pleaded, was the same for which the plaintiff was still in custody. Lord Ellenborough held that "the taking of the body in execution does not extinguish the debt, but it bars the remedy against the debtor, and in like manner precludes a set-off against him." Here the defendant being still in custody, the debt is not yet extinguished, but the plaintiff has no other remedy, since he is in the actual receipt of satisfaction, and has the means in his control of continuing that satisfaction till it becomes complete.

In Ex parte Knowell (1806) 13 Ves. 193, after a commission of bankruptcy issued, the plaintiffs committed defendant on ca. sa. The chancellor refused to allow them to prove under the commission, since their act "operated as a discharge." This is a peculiarly strong case because the arrest was made at the request of the assignees to compel the debtor to make certain conveyances.

In Franklyn v. Thomas (1817) 3 Mer. 225, in consequence of delay in filing a bill for a common injunction to stay proceedings at law, the plaintiff at law was enabled by demurring to the bill to gain time enough to take the defendant (Franklyn) in execution. The demurrer being subsequently overruled, Franklyn demanded to be put in the same position he would have occupied, if there had been no demurrer. Lord Eldon says (Id. 233): "It is true that when goods have been taken in execution, that may be easily set right. But here the taking in execution is a discharge of the debt." And on a subsequent day he says (Id. p. 234): "The order therefore to be made in this should be, that he shall be discharged on undertaking to again confess judgment, so that he may not afterwards say, the existing judgment and debt has been satisfied by the execution, from which he is now discharged." Accordingly, the order, which is reported at length (Id. p. 235), was prepared with evident solicitude to avoid on the one hand any implication of a continuing liability upon the old judgment, which was discharged by the release, and on the other to secure to the plaintiff at law, a new and original contract of equal value, accompanied by a warrant of attorney authorizing the confession of a new judgment in the same amount as the former.

A similar question recently arose in the case of Money v. Jorden, 20 Law J. Ch. 174, 15 Jur. 49, 13 Beav. 229, 1 Eng. Law & Eq. 146 (1850), and Lord Langdale relied on the case of Franklyn v. Thomas, and directed the same order to be made.

In Beaven v. Robins (1826) 8 Dowl. & R. 42, a plaintiff who was in execution for the costs of a former suit, brought a second action for the same cause, and the court refused to stay proceedings in the second until the costs of the first were paid. The imprisonment was sufficient.

The above cases not only sustain the position to which they are cited, but they also prove that it is not merely a sharp point of law, adhered to out of respect for ancient authority, but that it has been treated at all times, both by the judges at law and by chancellors, as a well-founded principle, to which a controlling force should be given in every case where it is either directly or collaterally involved. The original debt has uniformly and for all purposes for which it has ever been attempted to be used—whether as a set-off, the foundation of an assumpsit, or of a claim in bankruptcy—been held to be satisfied and the judgment to be valueless.

So far as the examination of the English law is concerned, it only remains,

III. To examine some particular cases, which are considered by the other side as exceptions to the general rule, but which in reality go far to illustrate and strengthen it.

1. Cases of escape. By the oldest authorities (Brooke, Execution, pl. 79; Y. B. 33 Hen.

VI. p. 47), an escape was considered as effectual a discharge of the debt as a release, and Blumfield's Case is the first decision to the contrary. The opposite doctrine was finally established in Whiteacres v. Hamkinson (1627) Cro. Car. 75; and the reason of it was given by Ashurst, J., in Jaques v. Withy (1787) 1 Term R. 557: "I know of only one case where a debtor in execution who obtains his liberty may afterwards be taken again for the same debt, and that is where he has escaped; and the reason of that is because he was not legally out of custody." The result of these cases then is, that where the prisoner has escaped of his own wrong, although the satisfaction which the plaintiff was receiving is temporarily interrupted in fact, yet in intendment of law the defendant is still in custody and may be retaken.

2. Cases of rescue, which depend upon the same principle as those of an escape. Jaques v. Withy; Lark's Case (anno 1430) 1 Hats. Prec. p. 17; Atwyll's Case (anno 1478) Id. p. 48; May, Prac. Parl. p. 107; 1 Hats. pp. 153–157; May, Prac. Parl. (anno 1603) pp. 113, 114. The defendant was never, in contemplation of law, out of custody.

3. Arrest of privileged defendants. The arrest of a member of parliament has from the earliest times been held irregular; and it was occasionally doubted whether such an arrest, followed, as it necessarily was, by a discharge, either upon writ of privilege or without it, did not operate like a release by consent as a total discharge of the debt. Thus, in the celebrated Case of Sir Thomas Shirley, Hatsell says: "It appears that the principal difficulty attending the release of Sir Thomas Shirley was the same that had occurred in the former cases of this nature, viz., 'That the warden would have been liable to an action of escape, and the creditor would have lost his right to an execution.' Nor was it in the power of the house of commons alone to give any security upon either of these points; it therefore became necessary in this case, as in the instances of Lark, Atwyll, &c., to make a particular law 'to secure the debt of the creditor, and to save harmless the warden of the fleet,' and in order to avoid this difficulty for the future, it was thought expedient to pass the general law of the first of Jac. I. c. 13." This act, after reciting that "doubt hath been made, if any person being arrested in execution and by privilege of either of the houses of parliament, set at liberty, whether the party at whose suit execution was pursued, was for ever after barred and disabled to sue forth a new writ of execution in that case," enacts, that after the expiration of the privilege, the party may sue out another writ of execution with the same effect as if the first had never issued.

The material question here is, to determine upon what grounds a second ca. sa. was in any case of privilege allowed to issue. In the case of Cassidy v. Steuart (1841) 2 Man. & G. 437, where the whole subject was examined with great research, the judges were all of opinion that the first ca. sa. was irregular and illegal. Bosanquet, J., says: "The arrest, therefore, of a member of Parliament would clearly be an illegal act. Page 471. But if the thing ordered to be done be illegal, the order must also be illegal." In the earlier privilege case of M'Cormick v. Melton (1834) 1 Cromp. M. & R. 525, 5 Tyrw. 147, 3 Dowl. (House of Lords) 215, Lord Lyndhurst, speaking of the effect of such a ca. sa. as between the parties, plaintiff and defendant, uses the strong language that "a writ set aside for irregularity is a nullity and void, and is no satisfaction of the judgment." Collins v. Beaumont, 10 Adol. & E. 225; Towers v. Newton, 1 Adol. & E. (N. S.) 319; Barrack v. Newton, Id. 525; Merchant v. Frankis, 2 Gale & D. 473. And this is the generally received law as between the parties, although the apparent regularity of the writ may be a sufficient protection to the officer serving it.

The case of privilege then as affecting the service of a ca. sa. is simply this: A plaintiff in possession of a valid judgment undertakes to enforce it by issuing an irregular and illegal execution, which, in the words of Lord Lyndhurst, is a mere nullity, and upon this writ the defendant is arrested, and of course discharged. It is evident that the first ingredient of satisfaction is wanting. The case is exactly the converse of an escape, for as in the one, the defendant, in the words of Ashurst, J., was never legally out of custody, so here he was never legally in custody. A good judgment cannot be satisfied, nor a valid debt extinguished, by serving an irregular, illegal, and void execution. This ruling is by no means peculiar to the case of privilege. As early as the case of Sir William Fish v. Wiseman (1627) Godb. 371, Dodderidge, J., stated the general principle in language quite as strong as Lord Lyndhurst's. "If the execution be lawful, and upon lawful process, and the party be delivered out of execution, then he shall not be taken again in execution. But if he be taken in execution upon an erroneous process, if he be delivered out, he may be taken again in execution; for the first execution is erroneous, and is no record, being reversed."

4. Cases of discharge from imprisonment by the Lord's act, &c. The discharge in these cases has always been held to be the act of the law, and not to imply any consent on the part of the plaintiff. In compliance therefore with the old maxim, the courts have taken care that this act of law shall in no way injuriously affect the plaintiff's rights. Thus in Nadin v. Battie (1804) 5 East, 147, where two were in prison, and one was discharged because of the plaintiff's refusal to pay the prison charges, Lord Ellenborough, on an application to discharge the other, decided that "the discharge cannot be said to have been with the plaintiff's assent, because he did not choose to detain the party

in prison at his own expense. Nor can the law, which works detriment to no man, in consequence of having directed the discharge of one defendant, so far implicate the plaintiff's consent against the fact, as to operate as a discharge of the other." The same, as will be seen hereafter, has been the ruling of the American courts, and for the same reasons here assigned.

5. Cases of debts payable by instalments. Davis v. Gompertz (1833) 2 Nev. & Man. 607. Where the judgment is to be satisfied by instalments, and execution is to issue upon non-payment of any of the instalments, it is held that a release from imprisonment upon one instalment with the plaintiff's consent, will not affect the remedy or bar the execution upon a second instalment. This is expressly upon the ground that the two executions are not for the same debt. Such was the principle that governed the case of Atkinson v. Bayntun (1835) 1 Bing. N. C. 444, which has been relied upon as an authority against the appellee. The defendants were in execution on one instalment, and a third party agreed upon consideration of their release, to be responsible for their appearance, should they become liable to a second execution. Such second execution having issued and the defendants not appearing, this action was brought upon the agreement. It was contended that the agreement was void at law; but per Tindal, C. J., * * * "There is no statement here from which we can infer that the debtor was to be charged a second time, in respect of the same sum for which he had already been in custody. On the contrary, by pursuing the calculation suggested by the agreement, it appears that the second execution was for a sum and a subject-matter different from the original one." Park, J. "It was the duty of the defendant to make it clear that the second execution was for the same sum, as much as if there had been an actual recaption, and the defendant had come before the judge to be discharged on account of a second arrest. Not having done so, it appears to me clear that the plaintiff is entitled to judgment." Vaughan, J. "It is clear that the second execution was not in respect of the same sum as the first." Bosanquet, J. "It was incumbent on the defendant, in order to raise any appearance of an answer to the plaintiff's claim, to show that the two sums were the same. Not having done that, and it being compatible with the whole of his statement that the sums should be different, our judgment must be for the plaintiff."

6. It may be proper, in this connexion, to notice the case of Baker v. Ridgway, 2 Bing. 41, 9 Moore, 114, which has also been cited on the other side. The defendant was in custody under a ca. sa.; a commission of bankruptcy was issued against him; the plaintiffs were compelled, by the St. 49 Geo. III. c. 121, to discharge him out of custody, before they could be admitted to prove their debt

under the commission; the commission was afterwards superseded on the ground of irregularity; and the defendant was again arrested. Affidavits were submitted by the plaintiffs, and relied on by the court, tending to prove that the irregularity by which the commission had been avoided, was the result of fraudulent collusion between the debtor and a portion of his creditors. This was a motion to discharge the defendant, and enter satisfaction upon the judgment. The rule was discharged. Such being the facts, it does not seem that the case differs materially from that of an escape. It was, in reality, an escape effected by an abuse of the forms of law, and the same may be said of it, as Ashurst, J., said of Jaques v. Withy: "The defendant was never legally out of custody." At any rate, he was never discharged by the consent of the plaintiff. That these were the grounds of the court's opinion, may be seen from many of the remarks reported by Bingham—thus Best, C. J. (page 46): "If this discharge has been obtained by a fraudulent commission, and the plaintiff has afterwards been cheated by a supersedeas out of the benefit sought by the proof of his debt, the defendant may be taken again, because the fraud has avoided the whole transaction, and the defendant has never been legally out of custody." Burrough, J. (page 48): "With a view to the privileges secured by that act (Sir Samuel Romilly's), a commission superseded, is equivalent to no commission. The plaintiffs who proved, have been induced by a force on their minds, to discharge the defendant." Whatever may be thought, however, of the grounds upon which the rule was discharged, the value of the decision as an authority, is seriously weakened by the manner in which it was extorted from the court. Best, C. J., himself says (page 46): "However, I consider myself no more bound by a decision delivered in the present summary mode of treating the question, than I should be by an opinion delivered at nisi prius."

From all the cases, then, we draw the conclusion that the English law is. and has been for more than four centuries, that the writ of ca. sa. is the highest sort of execution known; that it is capable of affording the plaintiff complete and absolute satisfaction, and that its execution will satisfy the judgment and extinguish the debt. unless this its regular legal effect be avoided by some after contingency. The only after contingencies, whether existing at common law or provided for by statute, which are allowed to have this effect, are an escape by the defendant's own wrong or effected by his actual fraud; a rescue; an avoidance of the writ for irregularity; an enlargement of the prisoner by act of law; or (since 21 Jac. I.) his death in execution. Upon the happening of any of these contingencies, the plaintiff having been deprived, without his own default, of the complete satisfaction to which his writ entitled him, the law will supply him with other

means of enforcing it. Archb. Com. Law Prac. (Ed. 1853) p. 257; Sewell, Sher. p. 198. If, however, after the execution of the writ, the plaintiff voluntarily consent to the discharge of the defendant from custody, while by such execution and discharge the judgment is satisfied and the debt extinguished at law, so the plaintiff's consent operates further as a confession of such satisfaction, and if properly presented to the court, will be entered of record on the roll. The policy of the law, moreover, prohibits the defendant from entering into any agreement by which the judgment or debt, upon which he is in custody, shall, for any purpose whatever, be made to survive his release, and pronounces all such agreements null and void. Nevertheless the discharge of the defendant shall be a good consideration for an original and independent contract, which, if afterwards violated, may be enforced by new proceedings. This last rule avoids the hardship to which creditors might otherwise, even against their inclination, be compelled to subject their imprisoned debtors, who are unable to liquidate their debt by actual payment, but can give satisfactory security in consideration of a discharge.

We have next to ascertain whether the American courts have adhered to the doctrines of the common law as expounded in England. The precise question as to the effect of the voluntary discharge of the debtor from custody, has, it is believed, never been decided by this court. But in two cases, the nature of the writ of ca. sa. has been incidentally discussed in the supreme court of the United States, so far as it bore collaterally upon points then before it. It was only necessary, therefore, to enter into this subject, and to press the conclusions far enough to meet the particular question presented. Thus, in U. S. v. Stansbury (1828) 1 Pet. [26 U. S.] 573, the question before Chief Justice Marshall was, whether the rights of a particular debtor were to be governed by the common law or by an act of congress. Having decided in favour of the latter position, he waives all argument upon the common law, and introduces his opinion by stating it in a form that was unquestioned on either side: "It is not denied, that at common law, the release of a debtor whose person is in execution, is a release of the judgment itself. Yet the body is not satisfaction in reality, but is held as the surest means of coercing satisfaction. The law will not permit a man to proceed at the same time against the person and estate of his debtor; and when the creditor has elected to take the person, it presumes satisfaction, if the person be voluntarily released. The release of the judgment is therefore the legal consequence of the voluntary discharge of the person by the creditor."

So, in the late case of Snead v. M'Coull (1851) 12 How. [53 U. S.] 407, the question was, whether a creditor's lien upon the lands of his debtor could survive the execution of a ca. sa. upon his person. Judge Daniel, delivering the opinion of the court, after showing that no lien on lands can be of superior binding force to that of an elegit, the capacity to issue which never survives a fully executed ca. sa., incidentally alludes to the nature of this latter writ, and the effect of a plaintiff's voluntarily releasing a defendant who is in custody under it. In so doing, he cites at length the strong language of the lord chancellor in Ex parte Knowell, and refers to the leading English cases of Vigers v. Aldrich, Tanner v. Hague, and Blackburn v. Stupart, already cited by us.

But, in U. S. v. Watkins [Case No. 16,650], the subject was fairly brought before the circuit court of the United States for the District of Columbia, and Chief Judge Cranch, in an opinion, in which almost every English authority is examined, sustains all the positions taken by us as to the English law, and recognises them as forming part of the law of Maryland, and therefore binding in the District of Columbia.

Since this decision, the case of Harden v. Campbell (1846) 4 Gill, 29, has been adjudicated in Maryland, and Chief Justice Martin sustains the conclusions arrived at by Chief Judge Cranch.

The case of Snead v. M'Coull, 12 How. [53 U. S.] was decided upon the law of Virginia, and the authorities of that state will be found peculiarly strong. Thus, in Windrum v. Parker (1830) 2 Leigh, 361, Carr, J., says (page 367): "That the levy on a ca. sa., and the release of the debtor from execution by the plaintiff or his agent, is an extinguishment of the debt, I have considered to be as well settled as any point can be, by an unbroken series of decisions." And in Noyes v. Cooper (1834) 5 Leigh, 186, Brockenbrough, J., says: "It has undoubtedly been established by a series of decisions, that where a defendant in execution under a ca. sa., has been discharged from his imprisonment by the direction or with the consent of the plaintiff, no action will ever again lie on the judgment, on which the execution is founded. Nor can any new execution ever issue on that judgment, even though the defendant was discharged on an express understanding on his part, that he should be liable again to be taken in execution, on his failure to comply with the terms on which the discharge took place."

In Massachusetts, Chief Justice Parsons, in the early case of Forster v. Fuller (1809) 6 Mass. 58, decided that a plaintiff who discharges his prisoner, "has no remedy on his judgment." So in King v. Goodwin (1819) 16 Mass. 63, the court were all of opinion, "that the debtor being committed to prison in execution, and liberated therefrom by the creditor, the judgment was satisfied, and a pluries execution upon which the levy on the land was made, was void." The same doctrine is affirmed in general terms in Dodge v.

Doane (1849) 3 Cush. 463, and in the last case (Coburn v. Palmer (1853) 15 Law Rep. 629), upon this subject, the supreme judicial court of Massachusetts, through that sound and discriminating judge and writer, Metcalf, C. J., use the following language: "But a commitment in execution is a discharge of the judgment, when the creditor consents to the debtor being released from prison, though the consent be given on terms that are not afterwards complied with; or upon the debtor's giving new security, which afterwards proves to be worthless; or, though the release from imprisonment be upon the debtor's express agreement that he shall be liable to be taken again on execution, if he fail to fulfil the terms on which he is released. In none of these cases can the creditor (unless circumvented by fraud) maintain an action on the judgment, or lawfully take out a new execution. Nor can he set off the judgment in an action maintained against him by the debtor."

In Vermont the law was early established in the case of Bailey v. Kimbal (1813) 1 D. Chip. 151, where one of two prisoners was released by consent, and the other escaped. Judge Hubbard states the rule very forcibly: "Where a debtor in prison is discharged from his imprisonment by the creditor, he cannot be retaken; it is a discharge of the debt itself. It is therefore immaterial to determine whether the escape of Jesse happened before or after the discharge of Stephen. The discharge of Stephen from his imprisonment being a discharge of the debt, must be good for him, and being so, it must be a discharge of all the defendants."

The same is the law in Rhode Island as is shown by M'Crillis v. Sisson (1840) 1 R. I. 143.

In New York the law has always been perfectly clear. In the early case of Yates v. Van Rensselaer (1810) 5 Johns. 364, the plaintiff agreed to enlarge the jail bounds, and afterwards the defendant escaped. The court held that the agreement was in effect a release from custody and the defendant could not be retaken. So in Cooper v. Bigalow (1823) 1 Cow. 56, where the defendant was discharged by consent, and the plaintiff attempted to use the judgment as a set-off. But the court held, that "the bodies of the defendants being in execution, this is in judgment of law, a satisfaction of the debt." And in Lathrop v. Briggs, 8 Cow. 171, and Ransom v. Keyes (1828) 9 Cow. 128, Judge Woodworth decides, in the clearest terms, that the release by the plaintiff's consent, either of the only defendant, or of one of several, is a discharge both of the judgment and the debt.

The law is the same in New Jersey, as shown by the cases of Miller v. Miller (1819) 2 South. [5 N. J. Law] 508; Strong v. Linn (1820) Id. 799; and Allen v. Craig (1833) 2 J. S. Green [14 N. J. Law] 102. In the latest of these cases, the court, where one of two defendants had been discharged with the plaintiff's consent, ordered the other to be discharged on motion, and satisfaction to be entered on the record, on condition that the said defendant would stipulate to bring no action on account of his imprisonment.

So, in Bowrell v. Zigler (1850) 19 Ohio, 362, the latest Ohio case on the subject, and which, under similar circumstances, was decided upon the same principle as the English case of Nadin v. Battie, Chief Justice Hitchcock says: "We suppose where a creditor causes his debtor to be imprisoned on execution, while the imprisonment continues it is a satisfaction. Or if the debtor is discharged with the assent of the creditor, it will operate as a satisfaction."

In Indiana, in the case of Prentiss v. Hinton (1841) 6 Blackf. 35, which is also similar to Nadin v. Battie, Sullivan, J., says: "The common law principle is that if a debtor, who is in custody under a ca. sa., be discharged with the plaintiff's consent, it operates as a discharge of the judgment."

So, also, in South Carolina, in the case of Eggart v. Barnstine (1825) 3 M'Cord, 165, Johnson, J., says: "By the common law, the discharge of a defendant, arrested on a ca. sa., was a satisfaction of the judgment."

The law of Pennsylvania in 1830 on this subject was the common law of England, and of the other American states, as laid down in the authorities we have already cited. In Freeman v. Ruston (1800) 4 Dall. [4 U. S.] 214, 217, the court said: "The law is settled in England that a ca. sa. operates as a satisfaction of the debt, as an extinguishment of the lien of the judgment. We have no other rule prescribed to us in Pennsylvania, nor can we conceive that there would be any policy or justice in departing from it. Sharpe v. Speckenagle (1817) 3 Serg. & R. 463, where the question arose as to the effect of a discharge under the insolvent laws of Pennsylvania, of a person in execution under a ca. sa. Chief Justice Tilghman said, "that the arrest on a capias ad satisfaciendum is in itself a satisfaction of the debt, is a position not to be maintained unless the plaintiff consented to the discharge; then indeed the debt is gone." The statute of 16th June, 1836, § 31, enacts, that "a judgment shall not be deemed to be satisfied by the arrest or imprisonment of the defendant upon a capias ad satisfaciendum, if such defendant die in prison, or escape, or be discharged therefrom by reason of any privilege, "or at his own request;" but the party entitled to the benefit of the judgment may have such remedies at law for the recovery thereof as he would have been entitled to if such capias ad satisfaciendum had not been issued, &c. And the case of Jackson v. Knight, 4 Watts & S. 412, so much relied on by the other side, was decided in 1842, and was governed by this act. The agreement to discharge the defendant from imprisonment was dated 10th October, 1840, and on the argument the counsel for the plaintiff in error cited the section above quoted.

II. There is no fraud nor any such mistake in the case as equity will relieve against. If there was a fraud, it was one practised by the plaintiff on himself. His own attorney drew this agreement exactly as he saw fit. He was not bound to draw it at all. He did it advisedly, of course. It is not only signed by him, but in his handwriting. To impute the successful perpetration of a fraud or a palpable ignorance of the rudimental principles of law and practice in the case of counsel so advised, so practised and so eminent, is what we should be slow to do ourselves, and what we will not suffer the other side so greatly to underrate the ability of our older and very able bar—as to do, even where they are without any other resort of argument.

GRIER, Circuit Justice. The bill is undoubtedly drawn with much ingenuity, and in view of the difficulties in which the learned pleader saw it to be encompassed. He has, therefore, by allegations of fraud and mistake, endeavoured to draw the case within those well known heads of chancery jurisdiction. But the facts and circumstances stated in the bill, show that there was neither fraud nor mistake in the case.

If a man, ignorant of the law that the release of one joint debtor is a release of the other, should give such a release, equity will not interefere to protect him against the legal consequences of his act. Hunt v. Rousmaniere, 1 Pet. [26 U. S.] 1. And even if the mere allegation of a mistake of the law would give jurisdiction to courts of equity, and be a sufficient ground for relief, the documents connected with this transaction, being executed by most able and learned counsel, leave not the slightest room for any pretence of a mistake of the law. On the contrary, it will appear (as we shall show) that they were fully aware of the legal effect and consequences of the voluntary discharge of the defendant from imprisonment, and obtained all that they expected to obtain by his arrest.

Assuming, for the purposes of this case, that if the defendant had obtained his discharge from the arrest by fraud and deceit practised on the plaintiff, equity would interfere and annul the discharge so obtained, as to all its legal effects prejudicial to the defrauded party; yet the facts stated in the plaintiffs' bill do not allege such a case. Thomson made no false representations in order to obtain his discharge; he made no concealment of his property; he gave security to pay the value of the property settled on his wife, if it should be determined that the property was liable to the payment of such debts; he fulfilled his contract in good faith. These facts are all admitted by the bill which sets forth the agreement. But the imputation of fraud, which it is supposed will justify the interference of a court of equity, is the fact that the defendant and plaintiff differ in their construction of the intention and legal effect of that agreement. And the bill prays that the defendant may be enjoined from setting up his construction of it in a court of law, by way of defence to the plaintiffs' claim. Much as this bill has been seasoned with the phrases "fraudulently, deceitfully," &c.; this is, in fact, all the fraud imputed to the defendant. A court of equity, when examining a bill of complaint to find a grievance which will justify its interposition, looks to the substantive facts averred in it, not to the adjectives or adverbs which may be added to qualify them.

The case presented by the bill, stripped of all unnecessary epithets, is, in short this: The complainants obtained a judgment against the defendant some twenty-five years ago. The only property in possession of the defendant, from which the judgment could in whole or in part be satisfied, was that contained in his marriage settlement, and conveyed for the trusts of that settlement. Whether this settlement was fraudulent or void as against creditors, and this property liable to be taken in execution, was a doubtful question. No bankrupt law was then in existence, by which the defendant could be compelled to assign for the use of his creditors, and thus have the question tried. The plaintiffs, therefore, arrest his body on a ca. sa.; the defendant proposes to give them security for the value of all the property contained in the marriage settlement, and all other of which he was possessed, if they will release him; and if, on the trial of an issue for that purpose, the court shall decide that this settlement was void, as against creditors, then the whole amount to be applied to the satisfaction of the plaintiffs' judgment.

By this contract the plaintiffs obtained a greater advantage than they could have expected from any general insolvent assignment. For if they had continued to hold the defendant's body, he might have made an assignment with preferences, and afterwards obtained his discharge under the laws of the United States. But by this contract they obtained all, even if that all turned out to be nothing. The chance of setting aside the marriage settlement was considered a good one, and well worthy of pursuit; while the expectancy dependent on the chances of his surviving his wife, and failure of issue, was held of no account.

We can see nothing in this transaction tending to show, either that the plaintiffs were not fully aware of the legal effect of the arrest and voluntary discharge of the defendant, or that, after having obtained from defendant an assignment with security to deliver all his property to the sole use of the plaintiffs' execution, they ever calculated on the probability or possibility that Thomson might thereafter acquire property, and be subject to future executions; or intended that this judgment should, notwithstanding his arrest and assignment, remain as an in-

cubus upon all his future struggles to amend his fortunes. Content with the surrender of all the property within the power and control of the defendant, they did not covenant for his future earnings or possible acquisitions, nor for the renewed imprisonment of his body at their discretion. It is not usual to exact such hard bargains. It was a case of actual mercantile bankruptcy, without a technical discharge under a bankrupt law; and we see no reason to believe that either party, at the time of the contract, had any intention that there should be any future recourse to the judgment. They took good security for the performance of the agreement which was the consideration of defendant's release, knowing that such a release would operate as a legal satisfaction of their judgment. The transaction was bona fide, without any suspicion of deceit, misrepresentation, or fraud, on the part of defendant. Why, then, should equity interfere, if the judgment stands satisfied at law?

When a plaintiff has a valid legal judgment, equity may interfere as ancillary to a court of law, to enable the plaintiff to reach means of actual satisfaction, which were beyond the grasp of an execution. But where a judgment is satisfied at law, equity will not interfere, unless where this satisfaction has been obtained by fraud or deceit, or made under some mistake of fact. As the facts exhibited by this bill, when severed from the epithets and adjectives used in framing it, show a transaction of which these qualities cannot be predicated; the defendant seems to have supported the first proposition of the hypothesis stated in their demurrer, viz., that if the arrest and discharge of defendant has operated as a legal satisfaction of the judgment, the plaintiffs have shown no sufficient ground for the interference of a court of equity. The second proposition, that if the arrest and discharge had no such operation in law, then plaintiffs have full and adequate relief at law, is one which needs no argument; and, as a necessary corollary, this bill would have to be dismissed.

But as the question as to the legal effect of this arrest and discharge will recur to us immediately, on the law side of the court, and as its decision cannot be avoided by leaving it to another tribunal; and, moreover, as it has been fully and ably argued by the learned counsel, it will be proper to notice it and state our conclusions.

The doctrines of law as laid down by Chief Justice Hobart, in Foster v. Jackson, Hob. 60, seem to have been sanctioned by the subsequent decisions in England and this country. Blumfield's Case, 5 Coke, 86b, reported by Lord Coke, which preceded it, is noticed in that decision. The difference of opinion between the learned judges, Coke and Hobart, as expressed in these cases, seems to have caused the statute of 21 Jac. I. c. 24, which gives an execution against a defendant's lands and goods, who has been arrested and died in prison. The question in Blumfield's Case arose, where the plaintiff had several judgments against joint and several debtors for the same debt. It was decided that the arrest and discharge of the defendant in one judgment was not actual satisfaction of the debt so as to bar an execution on the other judgment. The distinction between actual satisfaction as regards other parties bound for the same debt, and the legal and quasi satisfaction as between the parties, by an arrest and discharge of the defendant, is admitted in the case of Foster v. Jackson. To this extent Blumfield's Case has always been held as good law; but the other dicta and speculations of the learned reporter of that case cannot be received to affect the authority of the subsequent cases.

Without attempting to notice all the cases which are to be found in the more modern books of reports, the following may be stated as containing principles which have been universally admitted to be correct law, both in England and this country. They all proceed on the admitted axiom, that as between the parties, plaintiff and defendant, in the judgments, the arrest of the body of the defendant is legal satisfaction of the judgment, unless the party has been discharged by the act of God, or the act of law, without the plaintiff's consent.

Thus, in Vigers v. Aldrich, 4 Burrows, 2483, and Jaques v. Withy, 1 Term R. 557, it is decided, that if a defendant has been taken in execution and discharged on an agreement, the judgment is satisfied, and the action must be on the agreement. Clark v. Clement, 6 Term R. 525, and Tanner v. Hague, 7 Term R. 420, confirm the same doctrine. In Blackburn v. Stupart, 2 East, 243, reported by East, where the defendant was discharged on his agreement that he should be liable to be taken in execution again, it was held that the defendant could not be twice held in execution on the same judgment.

The question in the Pennsylvania case of Sharpe v. Speckenagle, 3 Serg. & R. 463, was, whether a discharge of the principal under the bread act, operated such a satisfaction of the judgment as could be pleaded by the bail in an action on his recognisance; and it was decided that it did not, on two grounds: 1st. Because the surety in a collateral suit could only set up actual satisfaction; and 2dly. The act of assembly permitting the discharge of the principal, provided that it should not acquit any other person bound for the debt.

This decision does not in the least deny the doctrine of the English case, Blackburn v. Stupart, already referred to and reported by East, but rather admits and affirms it. The other case, Jackson v. Knight, would, as a statement of common law doctrines, be somewhat anomalous; but this decision was after

the common law had been changed by statute, which allows another execution where the "defendant is discharged at his own request." The necessity for such a provision in the statute, is evidence of the state of the law antecedently.

If the plaintiffs in this case had exacted from the defendant, as the price of his discharge, not only an assignment of all his property, but also a covenant and agreement that the judgment should be considered as unsatisfied, and that his property and his body should be liable at any time thereafter to be seized in execution, we think it clear that this latter agreement would be treated at law as altogether void. The common law, while it gave the power to the creditor of seizing the body of his debtor in execution, discouraged the use of a power so liable to abuse. It treated such an arrest as the ultima ratio, the end of all executions on that judgment, and legal satisfaction of it; and while it left the imprisoned debtor capable of making any contract for future payment, as a consideration for his discharge by the creditor, it gave such creditor no further remedy than he could obtain by an action on such contract. An agreement made by the debtor, under duress of imprisonment, by which he should be again liable to imprisonment on the same judgment, was contrary to the policy of the law, and void. He was not permitted, when once in duress, to bargain away his liberty.

It is very evident, also, that an executory agreement which may be made the consideration of the discharge, even though indorsed on the execution, or filed in the court, can neither be treated as a judgment nor recognisance, or as matter of record of any description; and if it be not under seal, the action on it will be as liable to be defeated by a plea of the statute of limitations, as it would be on any other simple contract.

Now, the argument for the plaintiffs in this case assumes that the agreement was intended to give the plaintiffs a right to issue further executions on this judgment; and, as we have seen, if such were its literal tenor, it would be void. But we think it due to the plaintiffs to say, that a proper construction of this contract will vindicate them from the charge of exacting so hard a bargain from a debtor under duress of imprisonment, and more especially when the debt is one of suretyship only. Among mercantile men, if a debtor, and more especially a surety, surrenders all his present property to his creditors, it is not usual to exact a lien on his future acquisitions. This agreement, while it very properly demands, as the price of defendant's discharge, an assignment of all his property, and security for its delivery, in case the issue as to the validity of the marriage settlement should be adjudged in favour of plaintiffs, does not contain, in direct terms, any covenant that the arrest and discharge should not operate as satisfaction of the judgment, or that future executions might be issued on it. It merely states, in general terms, (what was no doubt a fact) that the agreement to release the defendant, was for his accommodation, and covenants that no "prejudice whatever should arise to the plaintiffs' right by the defendant's enlargement, or otherwise howsoever."

Now, the very learned counsel for plaintiffs, who dictated this instrument, well knew that this arrest and voluntary discharge of the defendant operated as a legal discharge of the judgment; and he knew, also, that a court of law would not regard any agreement for future execution made by a prisoner, as binding. He cannot, therefore, be presumed, by this very vague and indefinite language, to have intended what he was unwilling to express in plain terms, to wit, that the defendant having given good security for the delivery of all his property to plaintiff, as the price of his discharge, should nevertheless be liable to imprisonment the next day, or at any time thereafter. Yet such is the construction which it is now contended should be given to this language, a construction which makes the plaintiff take, and the defendant give, every thing for nothing.

What, then, may be supposed to have been intended by these words, "prejudice to the plaintiffs' rights?" When lawyers covenant about judgments and executions, they do not usually seek out such ambiguous and general phrases to express their meaning. What were the plaintiffs' "rights" which were the subject-matter of the contract? For to these must we look to ascertain the meaning of this clause. The right they contracted for, and for which they got security, was the application of all the property of defendant to their debt. Whether that all was much or little, cannot affect the case. They considered the marriage settlement as void; the chance of setting it aside valuable; and the chance from the possibility of Thomson's survivorship, without children of the marriage, as nothing. They accordingly agreed, that if the issue should be decided against them, the "property should be entirely discharged." Knowing that the discharge of defendant operated as satisfaction of the judgment, they were anxious that the "rights" obtained by the contract as a consideration for it, should not be affected. The language used plainly indicates some uncertainty in the mind of the scrivener, whether the discharge might not be possibly set up as actual satisfaction of the debt, and not merely as technical satisfaction of the judgment. To guard against any such attempt to affect or injure the "rights" which were the subject of the contract, and guaranteed to plaintiffs by it ex majore cautelā, was this language inserted in it. The words "otherwise, however," mean anything or nothing, and only tend to show that there was some vague notion of a possible legal

advantage which might be taken, and which the learned counsel could not foresee clearly, and thought might be excluded by these comprehensive terms.

The intelligent and honourable men who executed this agreement cannot be supposed incapable of expressing clearly their intention. Nor can we presume any intention to coerce the defendant into so hard a bargain, or conceal it under vague and ambiguous generalities, as a different construction of this agreement would import.

We are of opinion therefore: 1st. That the judgment against the defendant was legally satisfied by his arrest in execution and voluntary discharge. 2d. That this effect of his discharge was not affected nor intended so to be, by any thing contained in the agreement made on that occasion. 3d. That the bill shows no reason for setting aside this contract on the ground of fraud or mistake. 4th. That it is no part of the functions of a court of equity to enjoin a defendant from setting up a legal and just defence in a court of law, under the allegation that it is a fraud for him to differ with the plaintiffs in their construction of his contract. The defendant has as good a right to impute fraud to the plaintiffs for the construction they put upon it. The court imputes it to neither party, but dismisses the bill with costs. Decree accordingly.

[On appeal to the supreme court, the decree of this court was affirmed. 15 How. (56 U. S.) 281.]